Good morning, Your Honors. May it please the Court, Leon Hazani for the Respondent, Mark Farrales. At the outset, I'd like to request to reserve two minutes for rebuttal. In this case, the Board not only abused its discretion in denying the motions to reopen, but if the law was properly relied upon and applied to the administrative record before the Board, it would compel the absolute opposite result. First of all, the record is quite large and the issues seem to be complex, but I think it comes down to two issues. One is whether the due diligence exception applies, and then number two, did the change country conditions exception apply as to whether the motions to reopen were timely filed? And I believe the Board relied on incorrect law and also was arbitrary and irrational with regard to the application of the law to the facts in these cases. For example, with the due diligence, the Board doesn't contest that there's ineffective assistance of counsel. Not once do they contest that issue. They only say, look, once you became aware of the ineffective assistance of counsel, then you need to exercise due diligence. The petitioner in this case did exercise due diligence. The first time he became aware of the ineffective assistance of counsel and consulted with new counsel. And there's a reason, very rational explanation for that. First of all, the record is very clear that the respondent was suffering from pathological avoidance from his PTSD. But the Board, they say, let's just ignore that report. Let's give it diminished weight. They don't attack the report. They don't attack the credentials of the psychiatrist. They don't attack any aspect of the report itself, but simply say it was prepared in anticipation of litigation, so we're just going to give it diminished weight. I would propose that not only did they give it diminished weight, they gave no explanation really for it, and they didn't give it any weight at all. They didn't give it any weight at all. Well, you know, I, it's, we can't predict what the, you know, we can't speculate what the Board did or didn't do, but, you know, the argument I find a little bit more persuasive is the notion of changed country conditions. I agree. I believe the Board got that wrong legally. The Board didn't have the benefit of our decision in Chandra, correct? That's true, but they did have the benefit of the Malti decision, Malti versus Ashcroft. In fact, they cite to it, and in the same decision, they say, okay, well, Freedom House reports, we can't rely on those. That's not, we have no idea what those are. Those aren't persuasive at all. But the Malti case was a reopening of I can hear you. Yet they say No need to get excited. I can hear you. I apologize, Your Honor. Or we can hear you. They say, look, the Freedom House reports, how could we rely on those things? These, the Freedom House reports that we submitted were so clear, I believe a child could have seen that there was an increase in danger to the Petitioner in the case. They just go numerically. They go on a scale of 1 to 10, and each year, the conditions got worse and worse. And in Malti, I don't think the Court could say, oh, my God, prior to Malti, the conditions cited in Malti, no Coptic Christian could ever have made an asylum claim. That's absurd, because many Coptic Christians were making asylum claims prior to Malti. Let me just, what interests me about this case is that his own situation in the United States changed somewhat, correct? I believe it's analogous to the Chandra case, because He's pursuing his academic degrees, and one of his areas of interest, of academic interest, are the conditions. One hundred percent. And as a child, he wasn't, he was unable to express those opinions. His father expressed his opinions, was shot for it. As a child, he didn't have the capacity to do that. But as an adult, he devotes his life, he wants to make a distinction about, oh, well, these are academic articles. I mean, I would ask the Court to take judicial notice of what's going on in the Philippines today, which is you're allowed to shoot someone if they're suspected of a crime, and then you can ask questions later. Well, in 97 percent of those cases, when the police shoot and ask questions later, the individual is dead. There's no questions to be asked. The Board wants this Court to believe that a persecutor is going to go and make a distinction between an academic article and a journalistic article. And I think that that distinction doesn't really exist. As he grew up, he became more active. He devoted his life to expressing his political opinions. And as he grew up, the record showed it. No one ever said — Let me ask you, what is the exact relief you're seeking here? We believe that the case should be reopened, and for the first time in his life, he should be allowed to apply for asylum, for the first time in his life. He's never been given that opportunity. He was a derivative on his — He was a derivative on his father's claim, which wasn't his claim, which wasn't who he was. It wasn't who he became. Yes, we're — I'm not saying look only at the changed personal circumstances. I'm saying look at the changed personal circumstances as they relate to the deterioration of the conditions in the Philippines. And that's exactly what Chandra is about. And that's what the law was before Chandra. If the conditions worsen, then that's relevant. You can't just say, well, perhaps he could have made a claim before. So could have Chandra. So could have Malti. But the conditions in those countries continue to get worse. And at the time of his father's asylum was considered, there was a widespread belief that the conditions in the Philippines had improved so much that a man who was fighting corruption in his country, who was an attempted assassination against his life in front of his own home, with two shots to the head in front of his son, the conditions had improved so much that he wasn't entitled to asylum in this country. How could it be that we then must look back to 1998 to decide, well, perhaps he could have made a claim then. He was an adult. He didn't have an opportunity to express his opinions then and become who he would become. And he also was told, hey, you know what, the Philippines is great. Your father, you know, we realize he was shot in the head. That's fine. We realize he was anti-corruption and running on an anti-corruption platform. That's fine. But look, it's better. Don't worry about it. You don't need to you don't need to fear return. It's fine. And the board says the board says we didn't mean it when we said we affirm without opinion and adopted that ruling. We didn't really mean that. That was just an alternative ruling. We didn't really mean that at all. And I don't believe that that's the law. And I believe it's completely irrational to take the position in one breath that, yes, we've adopted that position. But years later, when it's convenient to say, well, we didn't really mean to adopt that part of the position. I think that that's irrational. I believe that it's contrary to law. And I believe they never in the aggregate considered every one of the diligence factors, every one of the change country conditions factors, and certainly never considered the change country conditions as they relate to his personal changes and the changes in his own life. You want to save some time for rebuttal? Yes, Your Honor. Thank you for the government. May it please the court. Victor Lawrence, on behalf of the attorney general. This court should deny this consolidated petition for review because the board acted within its considerable discretion when it denied petitioners motions. But did it apply to law correctly? It did apply to law correctly. How is that? Is your concern the Chandra case, Your Honor? Chandra is distinguishable for a number of reasons, Your Honor. First of all, if we're looking at the change circumstances exception, we have, first of all, you're correct that the board made this decision in 2011. Chandra came out in 2014. However, as Your Honor is aware, I know Your Honor drafted or wrote the Chandra opinion. That was a religious conversion case where there were changes not only in the person's personal circumstances, they changed their religion to Christianity, but there were significant changes in Indonesia where there was discrimination and persecution against. Well, why isn't that somewhat analogous to what happens here? I mean, we're not dealing with religion or, you know, like that here. When he went through on his father's application as a derivative, I mean, he was a young kid, right? He was a young kid. Now, at the time he files his motion to reconsider, he's an adult who has pursued an academic degree who's written about corruption. Right. And in particular, corruption in the Philippines. Okay. And you look at the circumstances in the Philippines from when they first went through as a derivative until when he filed his motion. You know, I'm concerned that the board really, really didn't take a hard look. I don't think so. And relating his situation to what's going on in the Philippines. I think in our brief at page 30, we talk about how there really has not been a significant change, material change in circumstances, between the time of 1998 and the original hearing and the present with respect to people who oppose corruption in the Philippines. That it's always been a problem. Conditions generally in the Philippines may have worsened for various reasons, but you have to look at what the potential asylum claim is here. That people opposing corruption are going to suffer from persecution. There's no showing that petitioner has made that conditions have worsened for those individuals. And that's the key of why Chandra is distinguished. Do you agree that, to a degree, worsening conditions, if they get worse enough, qualifies as changed conditions? Well, it all depends on what the person's claim is. You know, it doesn't matter if we're talking about Mexico, if conditions worsen with respect to drug dealers and the effect of what happens to somebody who commits a drug crime if the guy is not claiming asylum based on anything to do with drug crimes. By the same token, if the conditions are worsening generally in the Philippines for various reasons, it has no significance over this individual's claim for purposes of the motion to reopen analysis. If the changes have nothing to do with what he is arguing is his claim for asylum, which is that he is a person who is opposing or has a political opinion opposing corruption. Well, I mean, that sort of transitions to the fact that his personal circumstances have changed, right? Aside from growing up, you know, he's apparently become a well-known authority in this area of political corruption, right? Including in the Philippines now. Doesn't that change in personal circumstances, I mean, color, how we look at the changed country conditions? Well, I mean, in one respect, yes, Chandra does say that you have to look at the personal circumstances with respect to how it's relevant to the changing country conditions in the country that we're talking about. But you also have to look at that in the context of what the asylum claim is or would be should he be able to bring one after a motion to reopen. But in this case, we're talking about somebody, again, who says that he is going to suffer from persecution as a result of his political opinion. But how is his political opinion known to people in the Philippines? He wrote a couple journal articles. One of those journal articles that they rely on heavily is entitled Court Reform in Chile and the Philippines. And this is the most famous article he has in the Journal of International Relations. Who's to say that anybody in the Philippines has read this article and considers this scholarly work to be an incident in which he's expressing his political opinion? Also, it's an article with joint authors. It's authored by another individual, and Mark Feralas, the petitioner, is the second author. Who's to say whose political opinions are written in that article with respect to anything about the Philippines? Is it the first author or the second? So we have to look at the materiality of what he's presenting. There was some evidence in the record that his name was known, that his reputation was known in the Philippines. I'm sorry, where is that in the record? I just thought there was. Maybe I misread. Maybe there was something in the briefs or something. Right. Well, it's the government's position that his political opinion is not known in the Philippines, and that's why this is all not material. Of course, Malti requires that the information be material. There must be a material change of circumstances, material to the individual. And here he's not shown that his political opinion is known in the Philippines. He's wrote a few journal articles, and one of them that they rely on is his dissertation that he gave, I think, either for his master's or doctorate degree in California. How is anybody in the Philippines going to recognize this dissertation, if they even get a copy of it, as an expression of his political opinion? And that's why we think— Well, it's not going to take much effort on their part to figure out what his academic work is. Why would they even look into it in the first place? We send somebody back to the Philippines. We just put them on a plane and send them back, and that's it. Well, we don't send them with a copy of their law review articles or their scholarly journal articles. I don't mean to be facetious about it, but what I'm suggesting is the fact that— Do you think the government checks them out when they land? I'm sorry, Mr.— Do you think the government in the Philippines looks to see who's coming back? Certainly, but I think the idea that they would have any knowledge that he wrote these scholarly articles, and then, number one, whether he wrote them at all, does the government know that? And number two, do they consider them really to be an expression of his political opinion? And number three, is it really anything that they would persecute him upon once a scholarly article, just discussing, for instance, the court reform that he believes is necessary in Chile and the Philippines? Are those really expressions of political opinion that are going to subject him to persecution? The government thinks not. But looking at the strict analysis here on the motion to reopen, he has to show a change in— I gather—maybe I shouldn't speak too fast, but I gather you're not putting much emphasis on the equitable tolling argument we believe— No, I'm just—I didn't think that the board really— I mean, when I read the opinion, it's quite obvious they didn't have the benefit of our decision in Chandra. True, but I don't think it's— And that's what bothered me. But I was going to ask you to address the equitable tolling and effective assistance of counsel. And I will do that. And I just want—but while we're just still on the subject with respect to Chandra, I'd look at page 495 of the opinion of the April 11th—April 2011 decision of the board. In the penultimate paragraph is the one that probably concerns you, where it says change in personal circumstances—that it's a change in personal circumstances. Right. But if you look at the next paragraph, it goes on to say that, look, in any event, these papers—there's no suggestion that they're well-known in the Philippines or an expression of political opinion. So it's not—they're not only relying on this issue of personal circumstances. They're going on to say that, in any event, we're not persuaded that he's demonstrated it's a material change in conditions arising in the Philippines because whatever he's suggesting is his political opinion is not material to the claim of the changed country conditions in the Philippines. So the fact—even if you consider that statement about personal circumstances to be slightly wrong or not informed by the Chandra opinion, there's an alternate finding in the next paragraph, which Morden makes up for that as another reason why it's denying the claim as not meeting the standard under the motions to reopen the reg. Okay. Now, with respect to due diligence, look, you know, this is a guy who lost before the board his father through a derivative claim in 2002. He did nothing to address his immigration claim until 2010, and it was only after ICE picked him up to be deported from the country. So there were eight years— So when his father's application was ruled upon, how old was he? He was 23. In 2002, he was born in 1979, so in 2002 he was 23. Already a graduate of Harvard, I believe, magna cum laude, smart individual, but yet he did nothing to act on his immigration case. He knew he was here illegally. He had no status in the United States, but he waited eight years. And my opponent makes a very passionate case that, you know, there are circumstances here where he was suffering from PTSD. But over those eight years, he was able to graduate from Harvard magna cum laude, but he couldn't address his immigration case. It just doesn't sound realistic. Well, I mean, you know, I don't find it totally ridiculous, or I don't dismiss the argument out of the hand that, you know, when you're in that kind of situation, you just can't confront it. I mean, it's, oh, my God. But deliberate avoidance for eight years, Your Honor, particularly when he says that a lot of it had to do with the abuse of his father and his father was still alive up until 2006. But what happened between 2006 and 2010? Why could he still not address his immigration claim during that time? This report on PTSD did not come out in the first motion to reopen. It came out afterwards where they supplemented this report. But the board said, look, you know, they got this report to address the board's concern, obviously, that he had been deliberately avoiding it. So now they've come up with this excuse that he had PTSD. And the board legitimately said, look, this was done for litigation purposes. We're going to give it diminished weight. And the board also recognized, as they said in their opinion, that, you know, there's something that doesn't make sense here. If this guy was able to be such a success academically, very smart individual, why couldn't he do anything on his immigration claim? Why couldn't he consult somebody else? But now my point is also correct that, you know, the board, we're not challenging the ineffective assistance of counsel. We didn't challenge it. It doesn't mean that we believe that his prior counsel was ineffective. But we didn't say anything about it. The way he's saying he was ineffective is only because the prior counsel didn't advise him that he could get a student visa to obtain to go to Harvard. But that wouldn't have given him permanent status either. That would have only given him a student visa to attend Harvard. So and he also says that the prior counsel in 2002 didn't tell him anything about potentially getting. If he had gotten a student visa and the visa expired, could he have applied for asylum on his own? I mean, the answer is yes. So he didn't have that chance. Well, he didn't have the chance, but he didn't do anything to help himself during this time. Remember, the motion to reopen regs say that you have to reopen within 90 days of the final administrative board opinion. That was in 2002. And we're talking he didn't open until 2010, eight years difference. And from the government's point of view, he deliberately avoided his immigration case for those entire eight years. But certainly, under his standard, he didn't show due diligence with respect to his immigration claim. And therefore, he shouldn't benefit from a doctrine that's exercised extremely sparingly, the doctrine of equitable tolling. So therefore, we ask this court to, I see my time is up, but we ask this court to deny these petitions for review. He hasn't met the standards under the motion to reopen. And, Your Honor, despite my opponent's raising of the Chandra case, again, there's an alternate finding there, which this court may legitimately rely upon to the extent they believe that it wasn't informed by the Chandra opinion. There's still ample evidence in the record to demonstrate that the court did not abuse discretion. Thank you. Thank you. Your Honor, regarding the issue of PTSD, if the respondent was physically incapacitated and unable to leave his home, for example, we wouldn't be having this issue. But the government's position is no different than saying a domestic violence victim, once they're able to escape their abuser, is suddenly miraculously cured of all psychological issues associated with it. It's also a great deal of victim blaming. You can't say a domestic violence victim, for example, or a child abuse victim can't be successful academically. Has there never been a domestic violence victim that was successful academically? I mean, I think it's preposterous, the position. Well, their argument isn't completely preposterous, as you just said. I believe it's preposterous. I mean, they say that he's managed to get through Harvard and get his degree, and he couldn't consult with somebody about his. Because it's got nothing to do with the stressors that would have triggered the post-traumatic stress. If the board had actually considered the report, they would be much more educated and in a better position to evaluate that. Many victims are able to be successful in issues that have nothing to do with their victimization. And here, I do believe it's absurd, because all of his life facts, nobody disputes that he was 10 years old and two men walked up and shot his father in the head right in front of him. Nobody disputes that. Nobody. How is the PTSD a result of a litigation position? I think that that is an absurd position for the board to have taken. With regard to the Chandra case and the changing country conditions, I believe the government's position is also just completely wrong. They would have you believe that neither Malti nor Chandra could ever, no Coptic Christian, no Chinese Christian in Indonesia prior to those decisions would ever have been able to make out an asylum claim. That's not the question. The question is, did the conditions get worse? And in the record, we provided the corruption index showing the corruption in Philippines got worse and worse and worse. And that's exactly the kind of person they would go after. We also cited to other articles that the board just decided not to look at, like the rise in extrajudicial killings. That's at AR 739 and 781. When the government was addressing this, the government pointed out that what's at stake here are his academic articles. I believe that's just way too nuanced. The court correctly noted that when he's deported from the United States, if that were to happen, he's not going to simply walk into the Philippines embraced. They're going to check him out. And for the government to take the position that they couldn't simply on page one of Google find all of his articles and all of the information about him is very naive, extremely naive. And not only that, but before the board was the L.A. Times article showing that there is a public awareness of Mr. Feralas and what's going on with his life. And his case was widely covered by the Filipino media, widely covered by the Filipino media. It takes no more effort than a Google search of his name to find out all of the information. And for the government to take the position that a persecutor is going to go and explore the nuances. Well, his name is second on this article. Well, perhaps this is just an academic article. I believe it's just contrary to the asylum laws of this country. Okay. Thank you. Thank you, counsel. Feralas v. Lynch is submitted. Thank you very much.
judges: Reinhardt, Tashima, Paez